# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE CARRASQUILLO, | No. 4:16-CV-01651 |
| Plaintiff, | (Judge Brann) |
| v. | |
| SELINSGROVE AREA SCHOOL DISTRICT, | |
| Defendant. | |

## MEMORANDUM OPINION

### OCTOBER 24, 2018

The Selinsgrove Area School District moved for summary judgment on the complaint filed by Katherine Carrasquillo. For the reasons that follow, the School District's motion will be granted.

## I. BACKGROUND

Katherine Carrasquillo, a Hispanic woman, began working as a School District custodian in 2000.[1] By the beginning of 2014, she was the second-shift custodial supervisor at the District's intermediate school.[2] Near the end of that year, she was told that the District was considering appointing her as the second-shift custodial supervisor at the high school.

---

[1] Deposition of Katherine Carrasquillo (ECF No. 41-28) at 64.

[2] Deposition of Katherine Carrasquillo at 65.

Ms. Carrasquillo, however, resisted the move. She warned her supervisor, Troy Beaver (the School District's Director of Buildings and Grounds),[3] about the acrimonious relationship[4] she had with Donna Heimbach, the high school's first-shift custodial supervisor.[5] She also produced letters of support from several teachers whom she worked with at the intermediate school.[6] Despite her protests, the transfer was effectuated on December 29, 2014.[7] While it is unclear whether the move was made out of a need to fill the high school position or out of a desire to eliminate the intermediate school position (or perhaps both),[8] Ms. Carrasquillo

---

[3] Deposition of Troy Beaver (ECF No. 30-5) at 6.

[4] Deposition of Katherine Carrasquillo at 51-60 (describing aspects of that relationship).

[5] Deposition of Troy Beaver at 16 ("[S]he said she didn't really like Donna and didn't really want to work with her."); Deposition of Katherine Carrasquillo at 60 (Q: "[Y]ou believed . . . that the personality conflict between you and M[s.] Heimbach would make working for her untenable for you?" A: "I believe that he put us in a hostile environment which I told him. I begged him please don't put me there.").

[6] ECF Nos. 41-12, 41-14.

[7] January 6, 2015 Letter from the District to Ms. Carrasquillo (ECF No. 30-9).

[8] *See* Deposition of Chad Cohrs (ECF No. 30-3) (noting that the District was "in the process of . . . looking to phase out second shift supervisors"); Deposition of Katherine Carrasquillo at 7 (noting that Mr. Beaver told her "that he transferred [her] because he needed a supervisor in the high school"); Deposition of Troy Beaver at 10 ("I needed a position at the high school filled, a position for supervisor"); Deposition of Jeffrey Hummel (ECF No. 30-6) at 48 ("We were eliminating the second shift supervisors at the elementary and intermediate school."); Minutes from January 27, 2015 School Board Meeting (ECF No. 30-14) (noting that "[t]he transfer was made due to the need for a second shift supervisor at the high school"); Deposition of Susan Walter (ECF No. 41-7) (noting that Ms. Carrasquillo "would have a choice of going to the high school, keeping her supervisor title, or she could stay at the intermediate school but she would lose her title and part of her pay would be cut").

admitted in her deposition that she does not believe the transfer was based in any way on her race.[9]

As she perhaps anticipated, Ms. Carrasquillo quickly ran into some difficulties in her new position. In January 2015 she was written up by Ms. Heimbach for failing to do an "Outside Building Check,"[10] and was reprimanded by Ms. Heimbach for asking the other second-shift custodians (Kathy Snyder and Chris Shaffer) for their assistance with assigned tasks.[11] On January 27, 2015, Ms. Carrasquillo informed the School Board of her "ongoing issues" with Ms. Heimbach.[12] There is no evidence, however, that Ms. Carrasquillo raised any complaints about racial discrimination at that time.[13]

---

[9] Deposition of Katherine Carrasquillo at 51 (Q: "[Y]ou don't believe that your transfer to the high school was based on your race?" A: "No.")

[10] January 23, 2015 Write-Up of Ms. Carrasquillo (ECF No. 41-13); *see also* Minutes from January 27, 2015 School Board Meeting (indicating that Ms. Carrasquillo "received two letters of reprimand from" Ms. Heimbach).

[11] November 1, 2017 Deposition of Donna Heimbach ("First Deposition of Donna Heimbach"; ECF No. 41-2) at 22; Deposition of Troy Beaver at 22 (noting that Ms. Snyder and Mr. Shaffer told Ms. Heimbach that "they were doing most of [Ms. Carrasquillo's] work" and "[w]ere getting assigned tasks that they thought were within the purview of Ms. Carrasquillo's job").

[12] Minutes from January 27, 2015 School Board Meeting; *see also id.* (noting Ms. Carrasquillo's "two letters of reprimand from the first[-]shift supervisor" and that Ms. Carrasquillo "wants [to be] transferred out of the high school").

[13] Deposition of Katherine Carrasquillo at 87 (Q: "Did you tell the board or the superintendent during the [January 27, 2015 board] meeting that you believed that M[s.] Heimbach was discriminating against you on the basis of your race or national origin?" A: "I don't remember, I don't remember.").

In an April 2015 evaluation, Mr. Beaver described Ms. Carrasquillo's performance as "unsatisfactory," noting that he felt that Ms. Carrasquillo "need[ed] to be able to take constructive criticism[,] . . . to complete tasks in a timely manner, . . . [and] to work with fellow workers on communication."[14] Perhaps as a result of this evaluation, Mr. Beaver asked Ms. Heimbach to perform a "time study" on Ms. Carrasquillo, Ms. Snyder, and Mr. Shaffer in order to observe, analyze, and evaluate those employees' execution of their assigned duties.[15] At some time during this May 2015 time study, the two women engaged in a verbal altercation, during which Ms. Heimbach allegedly referred to Ms. Carrasquillo as a "Puerto Rican bitch."[16] The next day, after another verbal altercation (this one in a staff meeting), Ms. Heimbach allegedly asked the other custodians if Ms. Carrasquillo "think[s] I'm her nigger."[17]

Ms. Carrasquillo took her allegations of racially-charged comments to Mr. Beaver.[18] Mr. Beaver questioned the other employees about the epithets, but most

---

[14] April 16, 2015 Evaluation (ECF No. 41-18).

[15] Deposition of Troy Beaver at 46 ("I asked for a time study to see why things weren't getting done."); Deposition of Katherine Carrasquillo at 23 ("[Ms. Heimbach] was seeing how long it takes me to do my classrooms, watching what I do."); First Deposition of Donna Heimbach at 40 (Q: "At some point in time did you start participating in a time study?" A: Yes.").

[16] Deposition of Katherine Carrasquillo at 25.

[17] Deposition of Katherine Carrasquillo at 69.

[18] May 20, 2015 email from Katherine Carrasquillo to Troy Beaver (ECF No. 41-17); Deposition of Troy Beaver at 37 (Q: "Do you remember Ms. Carrasquillo complaining that Ms. Heimbach had called her a Puerto Rican bitch? A: I remember seeing an email—I don't

- 4 -

denied hearing them (or, in Ms. Heimbach's case, denied uttering them).[19] Ultimately, Mr. Beaver disbelieved Ms. Carrasquillo's account because he felt Ms. Carrasquillo was "disgruntled" about leaving the intermediate school.[20] As for the single employee who corroborated Ms. Carrasquillo's claim about Ms. Heimbach's use of the "n-word," Mr. Beaver "took that [corroboration] with a grain of salt," since that employee and Ms. Carrasquillo were "very close friends."[21]

Things did not improve for Ms. Carrasquillo at the high school. In a June 24, 2015 letter from the School District, she was informed that, "due to [her] unsatisfactory evaluation," she would not be given a raise.[22] Correspondingly, she was placed on an "Improvement Plan" that required her to, *inter alia*, "[h]ave appropriate and professional interactions with . . . colleagues and subordinates" and "[c]omplete scheduled tasks on a daily basis."[23] Additionally, over the next several months, a dispute arose over Ms. Carrasquillo's requests to receive her

---

think she ever told me fact to face that is what she said."); Deposition of Lori Long (ECF No. 41-5) at 16 (noting that Mr. Beaver asked about Ms. Heimbach's use of the "n-word").

[19] Deposition of Troy Beaver at 38 (Q: "Did any of them confirm that they heard [the "Puerto Rican bitch"] comment?" A: "No."); Deposition of Lori Long (Q: "Mr. Beaver asked you if the ["n-word"] comment was made?" A: "Yes." Q: "And what did you tell Mr. Beaver?" A: "Well, the whole group of us was standing there, and he said about had anybody heard Donna refer to something as [the "n-word"], and I said, yes, I did. And everybody else shook or said no. And I said, I did.").

[20] Deposition of Troy Beaver at 39.

[21] Deposition of Troy Beaver at 56.

[22] June 22, 2015 Letter from the School District to Ms. Carrasquillo (ECF No. 30-12).

[23] *Id.*

work assignments over email, which dispute ended in an email from Mr. Beaver to Ms. Carrasquillo directing her to receive her work assignments in person.[24]

On December 4, 2015, Ms. Carrasquillo was moved back to the intermediate school.[25] Although she lost her supervisory duties as a consequence of that retransfer, her rate of pay remained the same.[26] However, because her hourly wage was higher than other non-supervisory custodians, she was denied a raise in June 2016.[27]

On July 7, 2015, Ms. Carrasquillo filed a five-count complaint alleging employment discrimination (based on her age, race, gender, and national origin) and retaliation.[28] The School District moved for summary judgment on all counts of that complaint on May 7, 2018.[29]

---

[24] September 15, 2015 email from Mr. Beaver to Ms. Carrasquillo (ECF No. 41-15); *see also* First Deposition of Donna Heimbach at 56 ("Troy told her that she was not to be using email, that is not the way that . . . the job was supposed to be done.").

[25] January 6, 2016 Letter from the School District to Ms. Carrasquillo (ECF No. 30-10).

[26] *Id.*

[27] June 30, 2016 Letter from the School District to Ms. Carrasquillo (ECF No. 30-13).

[28] ECF No. 1.

Ms. Carrasquillo initiated two other employment discrimination and retaliation suits against the School District. *Carrasquillo v. Selinsgrove Area School District*, No. 17-CV-00625 (M.D. Pa. filed April 7, 2017); *Carrasquillo v. Selinsgrove Area School District*, No. 18-CV-00198 (M.D. Pa. filed January 28, 2018). These suits were later consolidated into the above-captioned action, ECF Nos. 19, 28, but Ms. Carrasquillo did not file a consolidated complaint.

The three complaints are all based upon her employment with the School District and raise the same types of claims, and her papers opposing the instant motion for summary judgment do not distinguish between the three complaints. Therefore, to simplify matters, this opinion

## II. DISCUSSION

In her papers opposing the School District's motion for summary judgment, Ms. Carrasquillo abandons her claims of discrimination based on age and gender[30] and her request for punitive damages.[31] She indicates instead that she is proceeding forward on three theories: (1) that the School District took some adverse employment action against her on the basis of racial or national origin discrimination;[32] (2) that she was subject to a hostile work environment based on racial or national origin discrimination;[33] and (3) that she was retaliated against for engaging in protected activity.[34] Those theories will be analyzed in sequence below.

### A. Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

    and accompanying order will refer only to the complaint filed at the above-captioned docket number.

[29] ECF No. 30.

[30] Brief in Opposition (ECF No. 40) at 1 n.1.

[31] Brief in Opposition § III.g.

[32] Brief in Opposition § III.b-c.

[33] Brief in Opposition § III.d.

[34] Brief in Opposition § III.e.

matter of law."[35] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[36] To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[37] When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[38]

### B. Adverse Employment Action Claims[39]

Ms. Carrasquillo asserts that her adverse employment action claims should be analyzed under the *McDonnell Douglas* burden-shifting framework.[40] Therefore, she must show that she suffered some adverse employment action under

---

[35] Federal Rule of Civil Procedure 56(a).

[36] *Lichtenstein v. Univ. of Pittsburgh Medical Ctr.*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986).

[37] Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[38] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[39] Ms. Carrasquillo brings her discrimination claims concurrently under Title VII, 42 U.S.C. § 2000e *et seq.*; under the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and under 42 U.S.C. § 1981. No matter the statutory basis, however, the analysis is the same. *See Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) ("In employment discrimination cases, [42 U.S.C. § 1981] claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964."); *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 317 n.2 (3d Cir. 2000) ("The analysis required for adjudicating [plaintiff's] claim under [the] PHRA is identical to a Title VII inquiry[,] . . . and we therefore do not need to separately address [plaintiff's] claim under the PHRA.").

[40] Brief in Opposition at 3. *See generally McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

circumstances giving rise to an inference of intentional discrimination.[41] Once this *prima facie* case is established, the School District is required to point to its "legitimate non-discriminatory reason" for the challenged action.[42] If it does, the burden shifts back to Ms. Carrasquillo to show that the proffered reason is pretextual.[43]

An "adverse employment action" is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[44] Ms. Carrasquillo, however, does a poor job of explaining which of the School District's actions she believes are legally adverse. To begin with, she notes that "the adverse employment action is not necessarily the transfer itself, but how the [School District] reacted thereafter."[45] This concession is appreciated, especially since Ms. Carrasquillo herself admitted that the transfer was not racially motivated.[46]

---

[41] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

[42] *Id.* The Third circuit has characterized this as a "relatively light burden." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

[43] *Makky*, 541 F.3d at 214; *see Fuentes v. Perskie*, 32 F.3d at 765 ("the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence").

[44] *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).

[45] Brief in Opposition at 5.

[46] Deposition of Katherine Carrasquillo at 51 (Q: "[Y]ou don't believe that your transfer to the high school was based on your race?" A: "No.").

Ms. Carrasquillo then lists what she describes as a "multitude of adverse employment actions apart and aside from the transfer itself," including "the disparate discipline imposed, the failure to give [her] a raise, the imposition of [the Improvement Plan] and a negative performance review . . . [,] the complete undermining of her supervisory authority over Caucasian employees[,] and subjecting her to a 'time-study' which amounted to [Ms.] Heimbach eerily following [her] in a harassing manner."[47] Ms. Carrasquillo unfortunately does not expound any further on these listed grievances; the Court will therefore do its best to decipher them.

Regarding the "disparate discipline imposed," this Court assumes that Ms. Carrasquillo is referencing Ms. Heimbach's "write-up" and reprimand in January 2015. Ms. Carrasquillo, however, does nothing to show that the legitimate, non-discriminatory reason given for those actions (her failure to perform the "Outside Building Check" and her requests for assistance from other custodians) is pretextual. Ms. Carrasquillo *does* make a passing reference to the fact that she "had [no] type of performance deficiencies prior to her transfer to the high school." This fact, however, does not show that her *post-transfer* performance was sufficient.

---

[47] Brief in Opposition at 6.

Regarding "the failure to give [Ms. Carrasquillo] a raise," it is unclear whether Ms. Carrasquillo is referring to the June 24, 2015 letter mentioned above or the School District's June 2016 refusal to increase her wage after her return to the intermediate school. Ms. Carrasquillo, however, fails to discredit the proffered rationales for either of those actions (her "unsatisfactory evaluation," or the fact that, after being moved to the intermediate school, she was no longer in a supervisory position). Similarly, Ms. Carrasquillo fails to show why the "imposition of [the Improvement Plan] and a negative performance review" were not due to her deficient performance.

The Court is unsure what is meant by "the complete undermining of [Ms. Carrasquillo's] supervisory authority over Caucasian employees." Ms. Carrasquillo does not explain the alleged "undermining" any further, and her "Counter-Statement of Material Facts" states merely that Mr. Beaver "admitted that it would have been improper for [Ms.] Heimbach to undermine [Ms. Carrasquillo] as a supervisor."[48] Finally, regarding the "time-study" ordered by Mr. Beaver, Ms. Carrasquillo has both failed to show that it was motivated in any way by racial animus (Mr. Beaver, after all, requested that Ms. Heimbach observe *all* of the second-shift custodial employees, not just Ms. Carrasquillo) and has

---

[48] Counter-Statement of Material Facts (ECF No. 41) ¶ 51.

failed to discredit Mr. Beaver's proffered reason (his desire to "see why things weren't getting done").

Ms. Carrasquillo's claims based on adverse employment actions, then, cannot survive.

C. **Hostile Work Environment**

The United States Supreme Court has held that a hostile work environment based on racial or national origin discrimination is actionable[49] if it is "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive [as] to alter the conditions of . . . employment."[50] For purposes of liability, however, it is important to identify *who* is responsible for creating the hostile atmosphere. If the perpetrator is a "supervisor"—*i.e.*, is someone who is "empowered . . . to take tangible employment actions against the victim"—then the employer may be held vicariously for the perpetrator's actions.[51] If the perpetrator is a co-worker, on the other hand, the employer is liable "only if it was negligent in controlling working conditions."[52]

Ms. Carrasquillo lists several occurrences she believes created a hostile work environment for her based on her race or national origin. She points to Ms.

---

[49] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

[50] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

[51] *Vance v. Ball State University*, 570 U.S. 421, 424 (2013).

[52] *Id.* at 424.

Heimbach's use of the "n-word" and the phrase "Puerto Rican bitch." She claims that, on occasion, she would "walk into a room and hear [unspecified coworkers] talking about Spanish," which coworkers would then "get quiet" when they "s[aw] [her] coming."[53] She believes that a "black doll" was once purposely moved from a shelf to a bucket.[54] And finally, she notes that an intermediate school teacher, in the context of discussing the upcoming presidency of Donald Trump, asked her if she had her "green card."[55] For purposes of this motion, this Court will assume (without deciding) that these events created an objectively[56] hostile work environment based on Ms. Carrasquillo's race or national origin.

Ms. Carrasquillo does not argue, however, that any of these acts were committed by a someone who was her "supervisor," as that term has been defined by the Supreme Court.[57] Therefore, she must point to evidence from which a

---

[53] Deposition of Katherine Carrasquillo at 38.

[54] *Id.*

[55] *Id.* at 46.

[56] *Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment—an environment that a *reasonable* person would find hostile or abusive—is beyond Title VII's purview.") (emphasis added).

[57] Ms. Heimbach testified that she was "supervisor of the high school, period," First Deposition of Donna Heimbach at 20, but Ms. Carrasquillo points to no evidence—nor can this Court find any—that shows that Ms. Heimbach was "empowered . . . to take employment action against" Ms. Carrasquillo. Although Ms. Heimbach was apparently able to "write-up" Ms. Carrasquillo, there is no evidence that her "write-ups" could have any tangible effect on Ms. Carrasquillo's pay, etc.

Ms. Carrasquillo *does* argue that "even if [Ms.] Heimbach was not [Ms. Carrasquillo's] direct supervisor, her actions towards [Ms. Carrasquillo] are certainly actionable under a 'cat's paw' theory of discrimination." Brief in Opposition at 8. Ms. Carrasquillo, however, does

factfinder could conclude that the School Board's actions vis-à-vis Ms. Carrasquillo's work environment were negligent. Unfortunately, Ms. Carrasquillo presents no argument on this issue in her brief.

Ms. Carrasquillo does not indicate precisely when the incident with the "black doll" occurred, nor when other employees were "talking about Spanish." She does not, however, claim that she reported these incidents to anyone at the school. Therefore, it cannot be said that the School District responded negligently to them.

Regarding the racially-charged remarks of Ms. Heimbach, Ms. Carrasquillo avers that these comments marked the first time she felt discriminated against because of her race or national origin,[58] and as noted above, Mr. Beaver responded to them by directly confronting Ms. Heimbach and potential witnesses. The only other claimed hostile incident that post-dates these remarks is the "green card" comment (made more than a year later, and for which the offender was suspended[59]), so even if it could be said that Mr. Beaver's response to Ms. Heimbach's language was negligent (an issue which this Court need not, and

---

not elaborate further, and since "arguments raised in passing . . . but not squarely argued[] are considered waived," *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997), this Court will not consider that theory of liability any further.

[58] Deposition of Katherine Carrasquillo at 68.

[59] Deposition of Jeffrey Hummel at 44.

therefore does not, decide), it cannot be said that that negligence contributed to the hostile work environment in any way.

Ms. Carrasquillo's hostile work environment claims, therefore, cannot survive.[60]

### D. Retaliation Claims

To prove her retaliation claims, Ms. Carrasquillo must show that the School Board took some adverse employment action against her because of her participation in a protected activity.[61] Retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework as adverse employment action claims.[62]

The only adverse employment action discussed by Ms. Carrasquillo as being arguably retaliatory is the School Board's June 22, 2015 decision to withhold her raise.[63] As discussed above, Ms. Carrasquillo has failed to show that the proffered reason for that action is pretextual.

Ms. Carrasquillo's retaliation claims, therefore, cannot survive.

---

[60] Ms. Carrasquillo argues that the School District violated her rights under the Equal Protection Clause by remaining deliberately indifferent to the race- and national origin-based hostilities she encountered at work. Brief in Opposition § III.f. Because Ms. Carrasquillo's Title VII-based hostile work environment claims have failed, this § 1983 claim fails as well. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("[T]he analysis for [§ 1983-based hostile work environment] claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

[61] *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

[62] *Id.*

[63] Brief in Opposition § III.e.

## III. CONCLUSION

For the reasons discussed above, the School Board's Motion for Summary Judgment will be granted. An appropriate order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge